## UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF NEW YORK

| | |
|---|---|
| John Yong Tang, Faris Al Kooheji, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITIC Capital Holdings Ltd.,  CITIC Limited, CITIC Capital Partners LLC,  GNC Holdings, LLC, ZT Biopharmaceutical LLC, Yichen Zhang, Yong Kai Wong,  Hans Allegaert, Kenneth A. Martindale, Tricia K. Tolivar, Cameron Lawrence, Susan M. Canning, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott,  Michele S. Meyer, Robert F. Moran, Evercore Inc.,  Gregory Berube, ABC Company, John Doe,<br><br>Defendants. | Civil Action No. 23-cv-1195<br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

John Yong Tang and Faris Al Kooheji ("Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendants CITIC Capital Holdings Ltd., CITIC Limited, CITIC Capital Partners LLC,  GNC Holdings, LLC, ZT Biopharmaceutical LLC, Yichen Zhang, Yong Kai Wong, Hans Allegaert, Kenneth A. Martindale, Tricia K. Tolivar, Cameron Lawrence, Susan M. Canning, Michele S. Meyer, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran, Evercore Inc., Gregory Berube, ABC Company and John Doe.

Plaintiffs make the following allegations pursuant to the investigation of their counsel and the extensive interviews and discussion with the former executives, former employees and consultants, the domestic and international franchisees, the suppliers, the owners of GNC

Holdings, Inc. ("GNC"), the financial professionals familiar with GNC's financial dealings, potential investor of GNC debt, as well as the people affiliated with Defendant CITIC Capital Holdings Ltd. Plaintiffs also make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## INTRODUCTION

1.     This Complaint concerns the  unlawful schemes by a number of state-owned Chinese corporations and individuals, GNC's Directors of the Board and senior management, and financial advisor to conspire with each other to enrich themselves at the expense of Plaintiffs and others similarly situated minority owners through racketeering activities, conspiracy, fraud, breach of fiduciary duty, negligence, and conversion.

## NATURE OF THE ACTION

2.     Plaintiffs bring this class action lawsuit on behalf of all similarly situated minority owners of GNC who are the shareholders of record of GNC Class A Common Stock as of April 21, 2020 when Plaintiffs announced the investigation into the GNC matter, excluding entities and individuals named herein as Defendants or affiliated with Defendants in this action.

3 .     Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., CITIC Limited, CITIC Capital Partners LLC,  GNC Holdings, LLC, ZT Biopharmaceutical LLC, Yichen Zhang, Yong Kai Wong, Hans Allegaert, Kenneth A. Martindale, Tricia K. Tolivar, Cameron Lawrence, Susan M. Canning, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer, Robert F. Moran, Evercore Inc., Gregory Berube, ABC Company and John Doe

violated the Racketeer Influenced And Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961, *et seq.*

4 . Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., CITIC Limited, CITIC Capital Partners LLC,  GNC Holdings, LLC, ZT Biopharmaceutical LLC, Yichen Zhang, Yong Kai Wong, Hans Allegaert, Kenneth A. Martindale, Tricia K. Tolivar, Cameron Lawrence, Susan M. Canning,  Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer, Robert F. Moran, Evercore Inc., Gregory Berube, ABC Company and John Doe perpetrated a fraud and conspired to perpetrate a fraud on the Plaintiffs and all  similarly situated minority owners of GNC.

5. Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., CITIC Limited and Yichen Zhang as the controlling shareholder of GNC, have breached the fiduciary duty owed to Plaintiffs and all similarly situated minority owners of GNC.

6. Plaintiffs contend that Defendants Yong Kai Wong, Kenneth A. Martindale, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer and Robert F. Moran  as the Directors of the Board of GNC have breached the fiduciary duty owed to Plaintiffs and all similarly situated minority owners of GNC.

7. Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., CITIC Limited, CITIC Capital Partners LLC,  GNC Holdings, LLC, ZT Biopharmaceutical LLC, Yichen Zhang have unlawfully obtained by conversion the property owned by Plaintiffs and all similarly situated minority owners of GNC.

8. Plaintiffs contend that the gross negligence by Defendants Kenneth A. Martindale, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott,  Michele S. Meyer, Robert F. Moran have caused grave detriment to Plaintiffs and all similarly situated minority owners of

GNC.

9.      Plaintiffs contend that Defendants Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott,  Michele S. Meyer, Robert F. Moran, Evercore Inc., Gregory Berube, ABC Company and John Doe have aided and abetted the conspiracy to defraud Plaintiffs and all similarly situated minority owners of GNC.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Plaintiffs' cause of action is pursuant to the Federal Civil RICO, 18 U.S.C. § 1961, et seq.

11.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and pursuant to  28 U.S.C. § 1332(d)(2)(A) as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregated claims of the individual class members exceeds $5,000,000, exclusive of interest and costs.

12.      The venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants CITIC Capital Holdings Ltd., CITIC Limited, CITIC Capital Partners LLC, Hans Allegaert, Evercore Inc. and Gregory Berube reside in the State of New York.

## PARTIES

13.      Plaintiff John Y. Tang ("Tang") is a citizen of the State of New Jersey, residing at 655 Summit Ave, Hackensack, NJ 07601. Plaintiff Tang was a minority owner of GNC who owned up to approximately 7.88% of GNC class A common stock in all relevant period of time. Plaintiff Tang was the largest individual shareholder of GNC.

14.     Plaintiff Faris Al Kooheji ("Kooheji") is a citizen of Bahrain. Plaintiff Kooheji was a minority owner of GNC. Plaintiff Kooheji and entities controlled by him owned up to approximately 2.36%  GNC class A common stock in all relevant period of time.

15.     Defendant CITIC Capital Holdings Ltd. ("CITIC Capital") is a global investment company headquartered in Hong Kong. Defendant CITIC Capital's official website listed its U.S. office at 410 Park Ave, Suite 540, New York, NY 10022. Defendant CITIC Capital is doing substantial business in the State of New York directly or through subsidiaries and SPACs, aka, blank check companies. Defendant CITIC Capital devised, planned, and executed the unlawful scheme to use Hayao and Hayao Holding as the front to seize GNC  at the expenses of the Plaintiffs and similarly situated minority owners of GNC.

16.     Defendant CITIC Limited is wholly owned by CITIC Group Corporation which itself is owned by Chinese government. Defendant CITIC Limited is located at 410 Park Avenue, 18/F, New York, NY 10022. Defendant CITIC Limited owns 19.99% of Defendant CITIC Capital and is the de facto controlling shareholder of CITIC Capital. Defendant CITIC Limited fully participated in Defendant CITIC Capital's GNC scheme, providing funding, direction and approval thereof.

17.     CITIC Capital Partners LLC ("CITIC Partners") is a wholly owned subsidiary and the private equity arm of Defendant CITIC Capital. Defendant CITIC Partners is located at 410 Park Ave, Suite 540, New York, NY 10022. CITIC Partners fully participated in Defendant CITIC Capital's  GNC scheme.

18.     Defendant GNC Holdings, LLC ("New GNC") is incorporated in the State of Delaware. Defendant New GNC's headquarters is located at 75 Hopper Pl, Pittsburgh, PA 15222. Defendant New GNC is wholly owned and/or completely controlled by Defendant ZT

Biopharmaceutical LLC. Defendant NEW GNC does substantial business in the State of New York. Defendant New GNC Defendant New GNC fully participated in Defendant CITIC Capital's GNC scheme.

19.     Defendant ZT Biopharmaceutical LLC ("ZT") is incorporated in the State of Delaware. Defendant ZT's headquarters is located at 75 Hopper Pl, Pittsburgh, PA 15222. Defendant ZT is wholly owned and controlled by Harbin Pharmaceutical Group Holding Co., Ltd. ("Harbin"), which is wholly owned and completely controlled by Defendant CITIC Capital and Defendant Zhang. Defendant ZT fully participated in Defendant CITIC Capital's  GNC scheme.

20.     Defendant Yichen Zhang ("Zhang") resides at 36 Stanwich Road, Greenwich, CT 06831. Defendant Zhang is the Chairman and CEO of Defendant CITIC Capital, the Chairman of Harbin, and the Chairman of New GNC. Defendant Zhang owns 3.07% of Defendant CITIC Capital. Defendant Zhang married the granddaughter of Yiren Rong, the former Vice President of China and the founder and Chairman of CITIC Group and is the member of one of the most prominent political families in China. Defendant Zhang is the Chairman of McDonald's China and director of several other leading companies in China. Defendant Zhang also holds key positions in several influential and important institutions in the U.S. and China. Defendant Zhang joined Carnegie Endowment for International Peace ("Carnegie Endowment") as Director of the Board at the invitation of William J. Burns, the current Director of Central Intelligence Agency, former President of Carnegie Endowment and former U.S. Deputy Secretary of State. Defendant Zhang is the mastermind of the unlawful scheme alleged herein.

21.     Defendant Yong Kai Wong ("Wong") is the Managing Director/General Counsel of Defendant CITIC Capital. Defendant Wong is also the Executive Vice Chairman of Defendant New GNC. Defendant Wong was the Director of the Board of GNC and was directed by

Defendant Zhang to engage in matters related to GNC. Defendant Wong fully participated in Defendant CITIC Capital's GNC scheme.

22.     Defendant Hans Allegaert ("Allegaert") is the Managing Director of Defendant CITIC Capital, the head of the New York office of Defendant CITIC Capital and CITIC Partners. Defendant Allegaert is also the Director of the Board of Defendant New GNC. Defendant Allegaert was directed by Defendant Zhang to engage in matters related to GNC and fully participated in Defendant CITIC Capital's GNC scheme.

23.     Defendant Kenneth A. Martindale ("Martindale") was the Chairman and CEO of GNC in all relevant period of time. Defendant Martindale is the mastermind of the unlawful scheme alleged herein.

24.     Defendant Tricia K. Tolivar ("Tolivar") was the CFO of GNC in all relevant period of time. Defendant Tolivar was also the Director of Board of wholly owned subsidiaries of GNC. Defendant Tolivar fully participated in the unlawful scheme alleged herein.

25.     Defendant Cameron Lawrence ("Lawrence") is the CFO of Defendant New GNC and was the Chief Accounting Officer of GNC in all relevant period of time. Defendant Lawrence was also the Director of Board of wholly owned subsidiaries of GNC. Defendant Lawrence fully participated in the unlawful scheme alleged herein.

26.     Defendant Susan M. Canning ("Canning") was the General Counsel and Secretary of GNC in all relevant period of time. Defendant Lawrence was also the Director of Board of wholly owned subsidiaries of GNC. Defendant Canning fully participated in the unlawful scheme alleged herein.

27.     Defendant Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer, Robert F. Moran (collectively "GNC Directors") were the Directors of the

Board of GNC in all relevant period of time.

28.     Defendant Evercore Inc. (the "Evercore"), through Evercore Group LLC, advised GNC on debt restructuring and bankruptcy in all relevant period of time. Defendant Evercore fully participated in the scheme alleged herein.

29.     Gregory Berube ("Berube") is Senior Managing Director in Evercore's Restructuring and Debt Advisory Group. Defendant Berube fully participated in the scheme alleged herein.

30.     Fictious Defendant ABC Company is a company that is controlled or affiliated with Defendant CITIC Capital and participated in the unlawful scheme alleged herein.

31.     Fictious Defendant John Doe is the individual or individuals who are affiliated with CITIC Capital, GNC or fictious Defendant ABC Company and participated in the scheme alleged herein.

32.     Defendants CITIC Capital, CITIC Limited, CITIC Partners, New GNC, ZT, Zhang, Wong and Allegaert are referred to hereinafter collectively as Defendant CITIC.

33.     Defendants Martindale, Tolivar, Lawrence, Canning and GNC Directors are referred to hereinafter collectively as Defendant GNC Management.

34.     Defendant Evercore and Defendant Berube are referred to hereinafter collectively as Defendant Evercore.

**FACTS**

A.   **The Background of GNC**

35.     GNC, headquartered in Pittsburgh, PA,  was a leading global health and wellness brand that was founded in 1935. The brand touches consumers worldwide by providing its

products and services through company-owned retail locations, domestic and international franchise locations, digital commerce and wholesale and retail partnerships across the globe. GNC's diversified, multi-channel business model has worldwide reach. At the time of the bankruptcy filing on June 23, 2020, GNC had 7,300 stores worldwide, including 5,200 retail locations in the United States and the remainder are locations in approximately 50 countries.

36.     GNC was a public company listed on NYSE.

37.     GNC's last available SEC 10-K filing is for 2019, which shows $1.650 billion in assets, $1.646 billion in debt, $2.07 billion in revenue, and $35.1 million net loss.

38.     GNC's Board of Directors was constituted of long-time GNC insiders who own near-zero GNC stock and neither care about nor serve the shareholders' interest. Plaintiffs and the other similarly situated minority owners of GNC did not have any representative on the Board.

39.     In 2013, GNC amassed over $1 billion high-interest debt primarily due to the borrowing for share buyback approved by the Board. Since then, the lender, which is constituted of a group of private equity and hedge fund firms, has exerted enormous influence on the Board and management. The interest payment has depleted the profit from the business operations.

40.     Defendant GNC Management have treated GNC as their personal property. They had uncontrolled power over GNC. Every year the Board has approved exorbitant compensation package to the directors and the senior management that is vastly detached from GNC's business performance. In 2019, GNC's market value dropped under $100 million, but the directors received compensation between $215,671 and $261,149 per person; Defendant Martindale received $7.11 million; Defendant Tolivar received $2.11 million. In the meantime, Defendant GNC Management have enjoyed lavish perks, e.g., private jet, while letting the corporate cost run rampant.

41.     GNC, under the control of Defendant GNC Management, has a long history of

regulatory actions and lawsuits against it and its predecessors. In 2019, several class actions were filed against GNC around the country based on allegations that GNC's false sale deceived customers into believing items were being offered at discounted price. Those cases were ultimately consolidated in the Western District of Pennsylvania for settlement purpose, Carter et al. v. General Nutrition Centers, Inc., 16-cv-633 (W.D. Pa.) and settled for $6 million in December 2019.

42.     On April 16, 2020, a class action lawsuit GNC commenced in the U.S. District Court for Central District Court of California Docket No. 2:20-cv-03545, alleging that GNC falsely portrayed a less desirable type of joint-health supplement as the preferable formulation of glucosamine.  The lawsuit was stayed due to GNC's bankruptcy filing in June 2020.

43.     GNC has extorted the franchisee store owners to purchase exclusively through its wholesale platform at price higher than retail by threatening the revocation of franchise agreement. Also, GNC threatened the franchisee store owners that their franchise licenses would be revoked unless they stopped selling non-GNC products. Further, GNC threatened the franchisee store owners that their franchise licenses would be revoked unless they entered into lease directly with the landlord as against the prior agreement.

44.     There were numerous incidents of GNC stopped paying contractor and vendors and threatened to revoke the agreements in the first and second quarters of 2020.

45.     Since October 2016, GNC has attracted many potential buyers, including a group led by the former executives of GNC, private equity firm KKR, and a long list of Chinese Companies. The Chinese companies include Fosun Group, a Shanghai-based conglomerate, ZZ Capital International Ltd., Zhejiang NHU Co., Ltd. and SinoPharm. All proposed buyouts were valued  at least around $4 billion. GNC Board and Management's response was GNC is not for sale.

### B. __The Scheme__

46.     In and around July 2017, Defendant CITIC began discussion with GNC about a joint venture in China and an investment in or buyout of GNC.

47.     On July 18, 2017, CITIC Capital and GNC entered into a Confidentiality Agreement to move ahead with the discussion.

48.     Defendant CITIC's goal was to acquire GNC to gain full control of its business and its invaluable consumer data. But its attempt to acquire GNC in its entirety met with resistance from GNC Board and Management, about which the Periscope Magazine in China published an interview with Defendant Zhang (the "Zhang Interview") on February 27, 2021 after CITIC acquired all GNC assets in bankruptcy proceeding. During the interview, Defendant Zhang was asked why he only obtained "40.1%[*sic*]" GNC ownership, not the controlling stake. Zhang responded that "[w]e did not get the controlling stake of GNC because GNC was a public company, the large shareholders did not want to sell. We would not be able to complete that transaction if we insisted on controlling stake." The reporter followed with the question "At that time, you wanted to get controlling stake, but the GNC Management was not willing to negotiate?" Zhang responded "Correct, GNC Management and The Board did not want to. So 40% of GNC share was the maximum percentage they wanted to sell."

49.     Accordingly, CITIC and Zhang devised and implemented an unlawful scheme, aiming at acquiring GNC at the expense of Plaintiffs and other minor shareholders under which CITIC would invest in GNC and obtain significant ownership of GNC, gain the access to GNC inside information and the control of GNC Board of Directors, deepen GNC's financial reliance on CITIC by dangling the possibility of debt refinancing, pull the rug when CITIC became the only possible financial supporter and acquire the financially distressed or bankrupted GNC.

50.    As the first strategic move, CITIC and Zhang proposed a $300 million investment in GNC in exchange for (i) formation of a joint venture between GNC and CITIC in China with the exclusive use of GNC brand, which effectively acquires GNC's lucrative Chinese business; (ii) GNC issues and sells the new convertible preferred stock to CITIC, which will give Defendant CITIC 41.02% voting right on as-converted basis.

51.    The investment would give Defendant CITIC 5 out of 11 seats on the Board and super voting and veto power for various key corporate matters because the approval thereof requires a Two-Thirds Majority of the Board. Such matters include: (i) any alteration, amendment or repeal (whether by merger, consolidation, operation of law or otherwise) of any provision of the Company Charter or other Company organizational documents, including the bylaws, in a manner inconsistent with this Agreement; (ii) any creation of a committee of the Board, or the delegation of authority to any committee of the Board (other than a committee constituted of independent directors formed with respect to a matter for which one or more Directors has recused themselves due to a conflict of interest); (iii) any extraordinary purchase, repurchase or redemption of capital stock; (iv) any appointment or removal of any Director, otherwise than in accordance with the Company's organizational documents and this Agreement; (v) any increase or decrease of the Total Number of Directors; (vi) any payment of any extraordinary dividend or other extraordinary distributions by the Company; (vii) the acceptance of any Acquisition, other than with respect to a sale of 100% of the Equity Securities of the Company to a third party in a transaction in which all stockholders of the Company receive the same per share consideration; (viii) (A) any amendment or modification of the Convertible Notes Indenture that would result in a reduction in the "Conversion Price" or an increase in the "Conversion Rate", each as defined therein, for the Convertible Notes causing a conversion price per share of Common Stock that is

less than the Conversion Price for the Convertible Preferred Stock or (B) any conversion of the Convertible Notes into Common Stock, or repurchase or redemption of the Convertible Notes in exchange for Common Stock, at a conversion or purchase price per share of Common Stock that is less than the Conversion Price for the Convertible Preferred Stock; (ix) any issuance of any Equity Security senior to or *pari passu* with the Convertible Preferred Stock; (x) the commencement of bankruptcy or receivership proceedings, or the adoption of a plan of complete or partial liquidation or resolutions providing for a complete or partial liquidation, dissolution, or winding up of the Company; (xi) the removal or replacement of the chief executive officer, president, chief financial officer, secretary, treasurer or any other executive officer; (xii) the incurrence of Indebtedness in excess of $10,000,000 in respect of any single transaction or in a series of related transactions; or (xiii) any New Issuance of New Securities in excess of $10,000,000 in respect of any single transaction or in a series of related transactions.

52.     It is clear both Defendant CITIC and Defendant GNC Management had to agree on the commence of bankruptcy, the restructuring of the corporate debt, the conversion of the corporate bonds, new investment in GNC and the compensation to the Directors and senior management. As the result, CITIC was in control of GNC's finance. Defendant Wong and Allegaert led the effort to address GNC's debt issues.

53.     Defendant CITIC had access to the full range of GNC financial data and gave GNC equity a valuation of at least $731 million based on its $300 million investment for 41.02% stake in GNC.

54.     Defendant CITIC knew that GNC's Chinese business alone is worth more than $300 million. Defendant CITIC's strategic investment in GNC will enable CITIC to profit enormously from the Chinese market and more importantly to obtain the control of the GNC Board

and the access to GNC's valuable inside information in order to complete CITIC unlawful scheme.

55.     The arrangement between Defendant CITIC and GNC enabled Defendant CITIC to eliminate the possibility of any tender offer for or investment in GNC from a third party by virtue of CITIC's 41.02% ownership and its control of the Board.

56.     Also, CITIC eliminated the possibility that GNC refinances its debt with a third party because (i) CITIC, by itself, can easily refinance the debt; and (ii) Defendant CITIC benefits the most from the refinancing of GNC's debt, which will drastically increase the value of Defendant CITIC's stake in GNC. No other party would be interested in doing this service for CITIC especially when CITIC is capable of doing so itself.

57.     The foregoing conclusion is supported by Defendant Berube's Declaration (the "Berube Declaration") to the bankruptcy court on October 13, 2020 that "[B]eginning in the third quarter of 2019, Evercore, along with the Debtors' other advisors, assisted the Debtors with an extensive marketing process targeted to US based investors in order to secure commitments to refinance the Debtors' funded debt obligations. As part of this process, the Debtors conducted a non-deal roadshow during which they and their advisors met with approximately 50 potential investors. In addition to the US marketing process, Evercore assisted the Debtors in exploring options with certain Asia-based lenders for a comprehensive refinancing package. At the same time, Evercore reached out to 12 financial and strategic buyers that it believed could be potential bidders for the Debtors' Assets. The Debtors did not receive any actionable proposals from either the refinancing or the strategic marketing process." In fact, Berube and GNC Management provided manipulated financial data to potential investors to not secure any refinancing deal.

58.     On February 13, 2018, Defendant CITIC completed its first strategic move when Defendant CITIC, through an entity that CITIC controlled, entered into a Securities Purchase

Agreement (the "Security Purchase Agreement") with GNC, pursuant to which GNC agreed to issue and sell to Defendant CITIC 299,950 shares of a newly created Series A Convertible Preferred Stock for an aggregate of approximately $300 million. The Convertible Preferred Stock is convertible into GNC's common stock at a conversion price of $5.35 per share. Defendant CITIC will own 41.02% of GNC on as-converted basis. Although preferred stockholders usually do not have voting rights, Defendant CITIC obtained 41.02% voting right on as-converted basis. The transaction valued the GNC equity at approximately $750 million.

59.     The Securities Purchase Agreement provide the address for Defendant CITIC as: c/o CITIC Capital Holdings Limited, 28/F, CITIC Tower, 1 Tim Mei Avenue, Central, Hong Kong SAR, Fax: +85225238312, Attention: Eric Xin, Yong Kai Wong, Hans Allegaert.

60.     Pursuant to the Securities Purchase Agreement, GNC and Defendant CITIC will form a joint venture in China that would be controlled 65% by Defendant CITIC and 35% by GNC.

61.     On March 6, 2018, at GNC's town hall meeting with employees, Defendant Martindale made various remarks about the Security Purchase Agreement with CITIC, "[w]e entered into an agreement with CITIC and Hayao, a Chinese firm." "CITIC is a Chinese private equity firm that owns a controlling stake in Hayao, which is one of the largest pharmaceutical brands in China. After many months of evaluation and some very diligent negotiations, we entered into an agreement to enter into a joint venture with Hayao." "So that is the joint venture part of the story. But there is a bit more – there is the $300M preferred convertible equity investment we announced." "[w]e reviewed and evaluated offers from many potential domestic and international partners. In the end, the offer from CITIC and Hayao not only had the best terms, but also created a great deal of synergy because of the JV opportunity we were working on." "CITIC's passion for GNC is infectious. They feel very strongly about the power of the GNC brand—not only in China

but across the globe." "Once the transaction closes, we will expand the size of our Board of Directors from 8 directors to 11. Our new board will have 5 members nominated by the current Board of Directors, 5 members nominated by CITIC and me."

62.     On May 17, 2018, GNC's stockholders approved the proposal to issue convertible preferred shares to Defendant CITIC.

63.     On November 7, 2018, GNC and Defendant CITIC entered into an Amendment to the Securities Purchase Agreement, pursuant to which GNC and Defendant CITIC agreed to complete the transaction in three steps. (i)100,000 shares of Preferred Stock will be issued on November 9, 2018 for a total purchase price of $100,000,000 ("Initial Issuance"); (ii) 50,000 shares of Preferred Stock will be issued on December 28, 2018 for a total purchase price of $50,000,000 ("Second Issuance"); and (iii)149,950 shares of Preferred Stock will be issued on February 13, 2019 for a total purchase price of $149,950,000 ("Third Issuance").

64.     On November 8, 2018, GNC and Defendant CITIC consummated the Initial Issuance and entered into a Stockholders Agreement. This Stockholders Agreement was not approved by the GNC shareholders.

65.     Under this Stockholders Agreement, Defendant CITIC, must vote "(a) affirmatively in favor of the election of each Investor Designee nominated to serve as a Director in accordance with this Agreement, (b) except in a Contested Election, affirmatively in favor of the election of each Company Designee and the CEO Designee nominated to serve as a Director in accordance with this Agreement, and (c) in a Contested Election, either, at the election of such Investor Entities, (i) consistent with the recommendations of the Board or(ii) in the same proportion as the Voting Securities not Beneficially Owned by Investor Entities are voted (including, if applicable, by written consent, or by voting by ballot or by submitting any alternative

proxy card necessary …" GNC has never had a Contested Election since the date of this Stockholders Agreement.

66.     This was by the design of GNC Board and Defendant Martindale to secure their precarious positions with Defendant CITIC's voting power in exchange for the favorable treatment to CITIC. In so doing,  Defendant CITIC and Defendant GNC Management were in absolute control of GNC's corporate fairs and were able to do whatever they desire without any consideration of Plaintiffs' interest.

67.     On January 2, 2019, GNC and Defendant CITIC consummated the Second Issuance pursuant to the terms of the Securities Purchase Agreement.

68.     On January 22, 2019, the Board of GNC, upon designation by Defendant CITIC, appointed Hsing Chow and Yong Kai Wong to the Board.

69.     On February 13, 2019, GNC and Defendant CITIC consummated the Third Issuance pursuant to the terms of the Securities Purchase Agreement.

70.     Thereafter Defendant CITIC and GNC formed the China joint venture in Hong Kong.

71.     On March 1, 2019, GNC entered into a Master Transaction Agreement to sell Nutra Manufacturing, LLC, which operates the Company's manufacturing business ("Nutra"), to International Vitamin Corporation ("IVC"), the U.S. subsidiary of Aland Nutraceutical Group in China. The parties agreed to a series of transactions, the immediate result of which was IVC's acquisition of a 57.14% stake in Nutra for an aggregate purchase price of $101 million, with GNC initially retaining a 42.86% interest in Nutra ("Remaining Interests"), which would be sold to IVC eventually in equal installments on or around each of the next four anniversaries of the date of the Initial Sale, for an aggregate purchase price of $75 million. The first installment of $18.75 million

is due on or around March 1, 2020 to provide additional liquidity to GNC during the Pandemic. Moreover, GNC could accelerate the entire payment of $75 million from IVC in early 2020 when the Pandemic hit. But GNC did not.

72.     In addition, GNC and IVC agreed to make a capital contribution to Nutra in an aggregate amount of $25,000,000 after IVE acquires the initial 57.14% stake in Nutra, paid on a pro rata basis in accordance with each of GNC and IVC's respective ownership interests in Nutra. IVC further agreed to repay GNC's capital contribution upon the closing of the final sale of Seller's Remaining Interests. GNC could accelerate the repayment of this approximately $10.7 million capital contribution from IVC to gain additional liquidity during the Covid-19 Pandemic. But GNC did not.

73.     GNC ended first quarter 2019 with $211 million in liquidity, $137.1 million in cash and $888.4 million in long-term debt.

74.     On April 8, 2019, GNC appointed Defendant Michele S. Meyer ("Meyer") to the Board. Meyer was designated by Defendant CITIC.

75.     Throughout 2019, GNC's financial condition continued to improve but the stock price kept tumbling primarily due to the investors' loss of confidence in GNC Board and Management.

76.     On September 30, 2019, GNC's cash and cash equivalents were $121.9 million, and debt was $858.6 million. No borrowings were outstanding on the $100 million Revolving Credit Facility at the end of the third quarter of 2019.

77.     GNC announced that it was reviewing a range of refinancing options, including discussions with financing sources in the United States and Asia, to further optimize the GNC's capital structure and enhance its financial flexibility. GNC also announced that it was pleased with

its progress in reviewing refinancing options and expected to complete the process in the fourth quarter of 2019.

78.     At the 3rd Qtr. 2019 earnings release conference call on October 24, 2019, Martindale stated, "In early 2018, we committed to a long-term process to reduce our leverage. Since that time we've reduced debt by over $440 million and lowered our net total leverage ratio from five times to 3.6 times … As mentioned on last quarter's call, we recently conducted numerous meetings with current and potential debt and equity holders. These meetings have led to productive and ongoing discussions and we believe that we are closing in on a longer-term resolution for our capital structure." In fact, GNC Management did not receive any actionable proposal from potential investors. Defendant Martindale and GNC Management intentionally handed large sums of cash to secured lenders without a long-term permanent solution to the debt structure.

79.     Tolivar added, "[w]e continue to expect free cash flow for 2019 to range from $90 million to $100 million … As I described in my remarks last quarter and noted in our press release earlier today, we are in the process of reviewing a range of refinancing options to further optimize our capital structure and enhance our financial flexibility. This work builds on the progress we made over the past year, as we reduced our indebtedness by approximately $400 million … We are working with an independent committee of the Board, supported by independent financial and legal advisers as we conduct a review and have had a series of discussions with financing sources in the United States and Asia. We are pleased with progress to-date. And while there can be no assurances, we are on track to complete our process in the fourth quarter … we spent a good part of the third quarter talking to dozens of different financing options and now we're in the stage where we're even very prudent working with independent committee to evaluate those options and

select the best one in the interest of the shareholders that are driving that value. So from a confidence perspective, we're doing all that we can to get this closed as quickly as possible. We want to be prudent through that process as we do so."

80.     Those statements are false and contradictory to the Berube Declaration that "[T]he Debtors did not receive any actionable proposals from either the refinancing or the strategic marketing process."

81.     Defendant GNC Management continued to reduce GNC's cash position to make additional payments to secured lenders without seeking a permanent solution to the debt refinancing issue for the purposes of keeping GNC in a constantly precarious financial situation where GNC could fail anytime. In so doing, GNC Management also provided enormous benefits to the secured lenders of GNC because any additional payment received from GNC would effectively reduce its cost in the event of acquiring GNC.

82.     In the meantime, Defendant CITIC continued to solidify its control over GNC and narrow GNC's options for debt refinancing. Defendant CITIC leaked to the media the false information of its bid to take GNC private for the purposes of derailing GNC's purported refinancing talks with other parties. On October 22, 2019, Bloomberg reported that "GNC's Chinese investor, Hayao, was considering a potential bid to take the GNC private, people with knowledge of the matter said. The Chinese company has been speaking with potential advisers about an offer for GNC, the people said, asking not to be identified because the information is private. GNC has lost more than half its value over the last year, giving it a market capitalization of $176 million at Monday's close. The company had nearly $900 million of debt at the end of June, according to a recent investor presentation."

83.     The false information of possible buyout of GNC terminated all the ongoing talks

for debt refinancing but the only one involving CITIC.

84.     In December 2019, Defendant CITIC and Tolivar held meetings in Hong Kong to discuss false information of possible buyout of GNC.

85.     Neither GNC nor Defendant CITIC provided any update on the debt refinancing or buyout in the 4th Quarter of 2019. By the end of December 2019, it was clear that Defendant CITIC was the only possibility for GNC's debt refinancing.

86.     On January 22, 2020, GNC appointed Rachel Lau and Alan Wan to the Board. Both were designated by Defendant CITIC. By then Defendant CITIC was in control of GNC's Board, its choices of debt refinancing and whether GNC continued as a going concern.

87.     According to GNC's SEC filing, as of December 31, 2019, GNC's total consolidated long-term debt (including current portion) was $862.6 million, including $159.1 million principal amount of 1.5% convertible senior notes due (the "Notes"), $448.5 million on our Tranche B-2 Term Loan (the "Tranche B-2 Term Loan") due in 2021, and $275 million on our asset-based Term Loan (the "FILO Term Loan") due in 2022.

88.     For years, GNC have been paying excessive amount of interest to the secured lenders. On March 31, 2020, the Company's contractual interest rates under the Tranche B-2 Term Loan, the FILO Term Loan and the Revolving Credit Facility were 10.1%, 8.0% and 4.0%, respectively.

89.     Tranche B-2 Term Loan Springing Maturity Covenant requires that all outstanding amounts under the Notes exceeding $50.0 million have  been repaid, refinanced, converted or effectively discharged prior May 2020. Otherwise the maturity date of the Tranche B-2 will accelerate from 2021 to May 16, 2020 (the "Springing Maturity Date").

90.     Many options were available for Defendants to resolve the springing maturity issue.

GNC could have (i) reduced the outstanding Notes amount to less than $50 million using cash on hand; (ii) used the loan that Plaintiffs offered, at least $70 million; (iii) accelerated the installment payment from IVC for the sale of Nutra in an aggregated amount of approximately $59 million, and the repayment of capital contribution of $10.7 million; (iv) negotiate with Notes holder to convert approximately $100 Notes, which is a viable option to Notes holders who will face total loss in case of the bankruptcy filing; (v) sought loan  under the Main Street Expanded Loan Facility that the Federal Reserve established on April 9 2020 to help business during Pandemic, for which GNC could draw up to 150 million at a low interest cost of SOFR +250-400bps; (vi) draw from the existing revolving credit facility, which has the low 4% interest rate; (vii) negotiate with lender for the waiver of springing maturity covenant; (viii) default on the term loan and negotiate with the lenders for more favorable terms. Any of those option will give a better result to Plaintiffs and other minority shareholders. But Defendants failed to do any of those. Defendants chose, not forced, the worse option for Plaintiffs and other minority shareholders, but the best for their own interest.

91.     GNC needed at most $109.1 million to repay, refinance, convert or effectively discharge the Notes by May 16, 2020 to satisfy this Springing Maturity Covenant. But according to the bankruptcy court filing by the Notes holders, neither Defendant CITIC nor Defendant GNC management held any discussion with the Notes holders to resolve the Springing Maturity issues.

92.     Springing Maturity Covenant is common and rarely causes bankruptcy.

93.     Defendants GNC Management and Defendant CIITC claimed that GNC filed for Chapter 11 because GNC could fully repay the indebtedness under the Notes or the Tranche B-2 Term Loan when they become due on the Springing Maturity Date.

94.     GNC's SEC filing shows that GNC had $137 million cash on March 31, 2020 and

$127 million on May 11, 2020. GNC had enough cash or had other options to work with the Notes holders to neutralize Springing Maturity. But Defendants have done nothing to address the springing maturity issue.

95.     GNC retained Defendant Evercore as its financial advisor in late 2018. The effort was led by Defendant Gregory Berube, a bankruptcy specialist and a Senior Managing Director at Evercore. GNC Management has been planning for bankruptcy for a long time, waiting for an opportunity to implement the bankruptcy plan to hand GNC to the secured lender in exchange for benefits for themselves.

96.     An enormous amount of cash, $49.63 million, has been spent on professional fees and other expenses in relation to Chapter 11 case in the first half of 2020 when GNC only needed $109.1 million to satisfy the Springing Maturity Covenant. Most fees were paid to Defendant Evercore.

97.     From January 1, 2020 to June 23, 2020 (the "Petition Date") when GNC filed for bankruptcy, the professional fees in relation to the Chapter 11 Cases were $34.2 million, which Defendants buried in selling, general and administrative charges. From June 24, 2020 to June 30, 2020, the professional fees and expenses in relation to the Chapter 11 Cases were $15.43 million, which were recorded as separate reorganization items. In total, Defendants has spent $49.63 million on the Chapter 11 cases as of June 30, 2020.

98.     Excessive amount of cash was paid to the secured lenders. GNC made an excess cash flow payment of $25.9 million to the secured lenders in April 2020.

99.     Five days before the Chapter 11 filing, Defendants Martindale and Tolivar were awarded $2,194,000 and $795,000 retention bonus respectively, and an additional $918,000 bonus to other executives so they can stay with GNC through the bankruptcy proceeding. Without the

bankruptcy filing, it is reasonable to expect that there would be no such windfall to Defendants Martindale and Tolivar.

100.    Despite such massive bleeding of cash, GNC maintained positive cash flow in first half of 2020.

101.    On March 16, 2020, GNC delayed the filing of Annual Report on Form 10-K for 2019 because GNC failed to secure the previously anticipated refinancing deal.

102.    On March 24, 2020, GNC received Defendant CITIC's decision not to refinance the Notes and Tranche B-2 Term Loan in the amount of nearly $600 million. During the Zhang Interview published on February 27, 2021, Zhang elaborated on this subject that "we found that GNC' interest payment for debt was tracking high, the necessary changes were not implemented … one way to reduce the cost is to refinance the high-interest debt, which is forming a new lending group, mainly Chinese banks, to get rid of the existing high-interest loan. However, in the middle of the refinancing the Pandemic hit and thus we accomplish the goal of reducing the high-interest debt though bankruptcy."

103.    On March 25, 2020, GNC filed the belated 10-K Annual Report for 2019. GNC reported consolidated revenue of $470.4 million in the fourth quarter of 2019. Cash provided by operating activities was $97 million for 2019; Full year 2019 free cash flow was $81 million and Adjusted EBITDA was $192 million. Reduced debt by $290 million during 2019 and ended fourth quarter of 2019 with $183 million in liquidity.

104.    During the morning conference call on the next day, Martindale and Tolivar said, "[w]e continue to review a full range of options to refinance our capital structure in both the U.S. and Asia." ""We will continue to explore all options to refinance and restructure our indebtedness." Tolivar declined, though, to "make assurances" that refinancing would be possible.

105.     GNC disclosed that GNC continued to evaluate all strategic alternatives to address upcoming springing maturities, including refinancing options in the U.S. and Asia, and if GNC were unable to refinance the debt, GNC may need to consider additional actions including: (i) Raising additional capital through short-term loans; (ii) Implementing additional restructuring and cost reductions; (iii) Raising additional capital through a private placement or other transactions; (iv) Disposing of assets; (v) Selling or licensing intellectual property. But except for (ii), Defendant GNC Management had no intention to take those actions because the only goal for them at that time was to file the Chapter 11 case.

106.     While concealing the fact that decision for bankruptcy had already made, Defendant GNC Management continued to claim they were active seeking options to avoid it. Defendant GNC Management stopped replenishing inventory and stopped paying contractors and vendors. GNC stopped rebate payment to franchisee stores. GNC also withheld rent beginning in April 2020 for some retails stores.

107.     On April 3, 2020, Martindale directed GNC to announce that GNC Management had implemented measures to reduce expenses and maintain flexibility to manage through these challenging times, including A reduction in operating expenses including a hiring freeze, eliminating corporate merit increases and other cost saving initiatives. A decrease in the number of field leadership roles as the company continues to optimize the store fleet. Reducing costs across the business with the exception of digital capabilities. Temporary furloughs for a significant portion of store and corporate associates across all levels of the organization.

108.     All those measures that were presented by Defendant GNC management as to cut cost, raise cash and protect the long-term prospect of GNC were actually meant to obtain a better reward package from the secured lenders once Defendant GNC Management handed GNC over to

the secured lenders.

109.    Defendant GNC Management has aggressively paid cash to the secured lenders even during the Covid Pandemic. Defendant GNC Management also increase the net intrinsic value of GNC at others' expenses. As the result, the secured lenders would be able to acquire GMC at lowered cost and in exchange would grant Defendant GNC Management a fat reward package, including retention bonus and 10% ownership in the new GNC.

### C.   Plaintiffs' Actions to Save GNC

110.    Many people contacted Plaintiff Tang since mid-2019, including fellow shareholders, GNC employees, franchisees, contractors, vendors, potential lenders, financial professionals and others who were affiliated with GNC. Many described Defendant GNC Management as self-dealing, incompetent and arrogant, expressing great concerns about Defendant GNC Management.

111.    On April 14, 2020, Tang established GNC Shareholder Advocacy Group (the "SAG"), an email list of concerned shareholders and others when Defendant CITIC and Defendant GNC Management's intent and actions not to protect the interest of minority owners became clear.

112.    On the same day, 2020, Tang dispatched a letter to Defendants Martindale and Moran. The letter urged the Board and the management to leverage everything in their power to resolve the pressing liquidity issue and avoid the filing of bankruptcy. The letter also proposed to have an open and candid discussion about the long-term prospect of the Company in the future, including:

- Restructuring of corporate indebtedness
- Disposing of non-core assets
- Sale of the Company
- Corporate governance in alignment with shareholder interest
- Executive compensation
- Stock price enhancement

- New business strategy and initiatives
- Permanent cost control and reduction
- Improvement of investor relationship

113.    On April 15, 2020, Defendant Martindale responded to Tang's letter: "Rest assured that our Board is actively engaged, working hard to explore all alternatives to preserve and maximize the value of the Company." This statement is false. However, Martindale's assurance received positive response from all GNC shareholders who reviewed the letter. In light of Martindale's false statement, Plaintiff Tang terminated the plan to call a Special Shareholder Meeting to save GNC.

114.    On April 17, 2020, Tang emailed to Martindale the information about the Federal Reserve's Main Street Expanded Loan Facility Program, which provides low-interest loan to aid business hit by the Pandemic.

115.    On April 19, 2020, Tang dispatched the second letter to Martindale, seeking response to certain extremely disturbing information and allegations from various reliable sources Those allegations include, but not limited to:

- GNC's Board and senior management are not seeking any solutions to the T2 spring maturity issue while several options are available, and instead are actively working with the lenders on the bankruptcy filing. I was told that GNC has positive free cash flow in the 1st Qtr. 2020 even in the midst of the coronavirus pandemic.
- GNC's Board and senior management colludes with the GNC creditors to defraud the shareholders for the purposes of orderly and gradually sinking GNC into bankruptcy and into the hands of GNC creditors at the minimum cost.
- GNC's Board and senior management deliberately rejected several tender offers in the past few years to serve towards the GNC creditors' ultimate goal of stealing the company at the expenses of the shareholders.
- GNC's senior management has purposefully not restructured the long-term debt in the best interest of the Company and engineered several default risks in the past few years to facilitate the seemingly inevitable bankruptcy filing in the interest of GNC creditors.
- GNC's senior management conspires with the GNC creditors to drive down the stock price so that crumbles, if any, to the shareholders from the bankruptcy proceeding constitutes a premium.

- GNC's Board and senior management's clear breach of fiduciary duty owed to the shareholders on the grounds of their numerous actions on record.

116.   In the letter, Tang stated "I kindly ask for your response by April 21, 2020. Otherwise, I must proceed to announce  the investigation of those allegations as I am compelled to instigate."

117.   No response from Martindale has been received. On April 21, 2020, Plaintiffs announced the investigation into the actions of GNC's Board and management in the press release.

118.   In the press release, Tang also proposed a public sale of GNC, stating that "GNC's true and fair value can only be determined and unlocked by the public sale. GNC is a leading global powerhouse of health and nutritional products with revenue of $2.07 billion, EBITDA of $191.8 million and net cash flow of $96.5 million in 2019. GNC has approximately $100 million in cash, $45 million receivable from IVC and $871.2 million in debt as of today.  In the United States, the average value of enterprise value to EBITDA (EV/EBITDA) in the retail and trade sector as of 2020 was a multiple of approximately 13.4x, 22.8x for online retail. A more conservative multiple of 10 would still give GNC an enterprise value of $1.918 billion and a net value of $1.19 billion after cash and debt, not counting China joint venture. By contrast GNC's current market capitalization is less than $35 million." "GNC has never been offered for sale but nevertheless has seen several attempts of acquisition in the past.  A public sale of GNC could attract companies like P&G (PG), Nestle (NSRGY), Hershey's (HSY), Amazon (AMZN) and other health/nutritional products companies domestic or international. The right buyer has the opportunity to acquire GNC at a low price, financing through the issuance of low yield bond or low interest loan." "The public sale is the only way to protect the shareholders from the possible collusion of the insiders, including the Board and Management, the creditors and CITIC(HKSE:

00267)/Harbin Pharmaceutical. CITIC/Harbin completed the $300 million investment for preferred stock to be converted to 40% of GNC common stock at $5.35/share. Currently CITIC/Harbin has 5 directors.  A backroom deal will embolden the Board and Management to push for the sham bankruptcy. The insiders will reap all the benefits of the bankruptcy, wiping out or greatly diluting the shareholders' stake. As the result, the insiders would own the debt-free GNC for less than $1 billion." "The public sale is warranted by the complete loss of confidence in the Board and Management. There shall be no doubt that this Board and Management do not serve the best interest of the shareholders. GNC's stock performance may not reflect the true value of GNC but it does indicate the ineptness of the Board and Management. Despite the mismanagement of GNC and constant injection of uncertainty and confusion in the market by the surprising, misleading and conflicting press releases one after another, the Board and Management rewarded themselves with $250K compensation to the directors and multiple million compensation to the Management when the GNC stock becomes penny stock and the employees earn minimum wages."

119.    Fitch analysts said in a note published in June 2020 that they believe that "despite its challenges, GNC has a viable position in the retail marketplace, as a segment leader in the vitamin, mineral and health supplement space with good brand recognition, a sticky customer base, and positive cash flow."

120.    On April 22, 2020, Martindale wrote back and lied that "[A]s we have previously informed you, the board of directors, the special committee and the management team are committed to maximizing the value of the company for the benefit of all stakeholders." At that time, Defendant GNC Management and Defendant CITIC were already in the midst of finalizing the bankruptcy filing. Martindale clearly did not consider Plaintiffs and other similarly situated minority owners as stakeholders. In the same letter, Martindale threatened Tang that Tang was "in

violation of US federal securities laws" and "[T]he Company reserves its rights with respect to these apparent violations".

121.    On April 22, 2020, GNC received the written notice from NYSE that the Company was no longer in compliance with the listing requirements.

122.    GNC announced that GNC intends to timely notify the NYSE of its intent to present a plan to cure the Market Capitalization Deficiency and restore its compliance with the NYSE continued listing standards. But in fact, GNC had no intent to present the plan or to cure the deficiency because GNC Management and CITIC already decided to file bankruptcy.

123.    Plaintiffs have discussed about the options to protect their interest. Tang contacted the companies that previously approached GNC for buyout and potential lenders for GNC. But no one was interested anymore, citing the difficulty in previous dealing with Defendant GNC Management, Defendant GNC Management's clear intent to favor secured lenders, and Defendant CITIC's involvement.

124.    In addition, Tang had discussion with a private equity firm for a potential buyout of GNC and reached out to Defendant CITIC through a third party to explore the possibility of purchasing Defendant CITIC's stake in GNC. Defendant CITIC's response was their stake in GNC was not for sale.

125.    Plaintiffs continued to explore all options to save GNC. Plaintiff Kooheji led the lender consortium to offer the loan to GNC. On April 27, 2020, Plaintiff Kooheji emailed to Martindale to offer a loan as follows:

"…

I hope you are keeping safe during this pandemic. I am a large shareholder of GNC (below 5%) & I've been following up with GNC's struggle in Re-financing there secured loan. The argument & disappointment in how we got in this liquidity crisis should be postponed for now, As I strongly believe in the company's potential E-commerce growth. I do not know

more then what GNC has already released publicly on the re-financing struggle. If you were able to successfully secure a federal grant/assistance; I am unaware. Assuming GNC will default on there payment terms due to insufficient cash, I would like to potentially over some sort of **mezzanine financing** or **bridge loan**. Of course the JPMorgan FILO & B2 loan will remain SENIOR to my proposed offer. I am happy to hear any potential offers from your side as well. My priority is to NOT see GNC Default & render my common equity shares worthless.

…"

126.    On April 28, 2020, Defendant Berube acknowledged the receipt of the offer by email. On May 5, 2020, a conference call was set up to discuss Kooheji's offer, during which Kooheji said the lender consortium would be comfortable to offer $30 - 40 million and would accommodate if GNC needed more. Defendant Berube did not give any information about GNC's needs but falsely indicated there could potentially be another lender. After the conference call, Berube did not make any further contact.

127.    On May 11, 2020, GNC released earnings report for 1st Qtr. 2020. GNC reported consolidated revenue of $472.6 million in the first quarter of 2020, compared with consolidated revenue of $564.8 million in the first quarter of 2019. The decrease in revenue was largely due to the closure of company-owned stores under the store portfolio optimization strategy, sales declines during the second half of March due to the COVID-19 pandemic, the transfer of the Nutra manufacturing to the Manufacturing joint venture ("Manufacturing JV"), U.S. company-owned negative same store sales and lower domestic and international franchise revenue. E-Commerce revenues grew approximately 25% compared with the first quarter of 2019 driven by improved site performance and increased demand related to COVID-19. Implemented e-commerce order management system early in the first quarter of 2020 and accelerated ship from store capabilities in over 100 locations in the second quarter of 2020. Launched curbside pickup in the first quarter to allow our customers to continue to receive their needed GNC products while enabling social distancing. Due to impacts of COVID-19, the company has significantly reduced inventory

purchases and capital expenditures, as well as taken action to decrease costs by nearly $40 million in 2020 consisting of employee furloughs, marketing reductions, store hours reductions and deferral of non-essential spend. The company continued to evaluate all strategic alternatives to address upcoming debt maturities, including refinancing and restructuring options. For the first quarter of 2020, the Company reported a net loss of $200.1 million compared with net loss of $15.3 million in the prior year quarter. Excluding non-cash long-lived asset impairment charges and certain other expenses as outlined in the table below, adjusted net loss was only $11.0 million in the current quarter, compared with adjusted net income of $19.0 million in the prior year quarter.

128.    During the conference call on May 11, 2020, Tolivar provided the details on GNC's financial condition, "We ended the quarter with $137 million in cash, which includes $30 million in borrowings under our revolving credit facility. First quarter free cash flow decreased $16 million in the quarter, mainly due to a decrease in operating income and unfavorable changes in working capital. In April, we drew another $30 million on our revolving credit facility, and as of today, we have $127 million in cash on hand. In terms of our capital structure, we're exploring several options to refinance and restructure debt. While we continue to work through alternatives to address these maturities, we cannot make any assurances regarding the likelihood, certainty or exact timing of any alternatives. Additionally, substantial doubt exists regarding our ability to reduce the amount of outstanding under the convertible notes to less than $50 million by May 16, 2020, a requirement to avoid the springing maturity of the B-2 Term Loan, the FILO and the revolving credit facility. Failure to complete a refinancing or other out-of-court restructuring, obtain an extension of the springing maturity or to reach an agreement with required lender group's under the credit agreements prior to May 16, 2020 with respect to the springing maturity or to otherwise reach an agreement with the company's stakeholders on the terms of an out-of-court restructuring would

have a material adverse effect on the company's liquidity, financial condition and results of operations and may result in filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in order to implement, which is expected to be renegotiated restructuring plan. We are currently in discussion with the lenders to move the springing maturity and believe the parties will see, it is in everyone's best interest to do so. This will, by no means, be an easy year for GNC, regardless of our past as we continue to optimize our store footprint, reduce costs and reopen our temporarily closed stores. We expect adjusted EBITDA performance to improve in the back half of 2020. This does assume the impact of COVID-19 continues to lessen over time rather than a return to lockdown across the globe." Tolivar misrepresented and concealed the fact that the bankruptcy filing has been decided and the preparation was ongoing.

129.    Defendant Martindale and Tolivar avoided questions  on the conference call.

130.    On the same day, Martindale sent a letter to employee and franchisee, preparing them for the bankruptcy, "[w]e are exploring all options available to address our capital structure. As part of this process, we are working closely with our key stakeholders to come to resolution that will allow us to address our capital structure – which has been exacerbated by the current pandemic. Many strategic alternatives are being thoughtfully considered by GNC and its advisors, including potentially filing for voluntary protection under Chapter 11 of the U.S. Bankruptcy Code. Bankruptcy can seem like a scary word, but I want to be clear that all of the strategic alternatives that GNC is considering contemplate that GNC's door will remain open. Even if GNC were to file for Chapter 11 bankruptcy (and it bears repeating that no such decision has been made), we will continue operating while addressing our balance sheet." Shortly after, this email quickly disappeared from GNC's email system according to a source. Here, Martindale for the first time revealed the plan of bankruptcy filing only to employees, and continued to lie to Plaintiffs and

other situated minority owners about the bankruptcy.

131.    In the wake of the earning release, Plaintiffs who were unaware of CITIC's scheme, decided to approach Zhang and CITIC again to propose a joint effort to save GNC. At that time, Plaintiffs and other shareholders that were in contact with Plaintiff owned approximately 13% of GNC stock. Together with CITIC's 41.02%, Plaintiffs would gain control of GNC.

132.    On May 20, 2020 and following days, Tang and Zhang had discussion through a former corporate officer of CITIC Capital because Zhang suggested no direct talk. Zhang also said he had formed a task force to handle the GNC's matter. After Zhang pretended to show interest in Tang's proposal for joint control of GNC, Tang discussed with a former GNC executive about possibly forming a new management team. A week later, Tang followed up on this this matter with Zhang and Zhang responded, "not now, maybe later".  Zhang's lie caused Tang to hold all other shareholder actions to save GNC.

133.    Also, on May 14, 2020, Kooheji followed up with Berube, keep pushing the loan offer after several day of non-responsiveness from GNC. Kooheji offered  $70 million or more to GNC as an unconditional loan, stating that GNC did not need anything near that amount to prevent the springing maturity. Kooheji urged Berube to respond immediately. GNC had $127 million in cash on May 11, 2020, which, with the additional loan from Plaintiffs, would be more than enough to reduce the outstanding Notes balance down to less than $50 million and thus would resolve the springing maturity issues.

134.    Defendant Berube did not respond.

**D.    The Bankruptcy Filing and the Sale to CITIC**

135.    On May 15, 2020, Defendants Martindale, Tolivar and GNC Management announced that it has reached an agreement with required lender groups to extend the springing

maturity dates from May 16 to August 10, 2020, subject to certain conditions that, if not met, would cause the extended springing maturity date to move forward to June 15, 2020.

136.    On June 12, 2020, Defendants Martindale, Tolivar and GNC Management disclosed that GNC and Lenders agreed to extend the springing maturity date again from June 15, 2020 to June 30, 2020.

137.    Defendants Martindale, Tolivar and  GNC Management released the news about extension of the springing maturity date to the public for the purpose to  mislead Plaintiffs and other situated minority owners that they were working on a solution to the springing maturity to avoid bankruptcy, but in fact, they only need those extension to secure the best compensatory package to themselves and to grab the greatest monetary benefit from the bankruptcy.

138.    On June 23, 2020 (the "Petition Day"), GNC filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code.

139.    The bankruptcy restructuring would wipe out the GNC equity. But it would greatly benefit GNC Management and Evercore that collect significant amount of fees. After the restructuring, the secured lenders will own 100% of the new company's common stock. The secured lenders awarded 10% of the new company's common stock to Defendants Martindale, Tolivar and Defendant GNC Management.

140.    Alternatively, Defendant CITIC  and GNC reached an agreement for a stalking horse bid of $760 million to acquire GNC's assets that includes $126 million cash in GNC bank accounts as of the closing date and approximately $60.7 million future payment to GNC from IVC. Defendant CITIC would complete the purchase with $400 million loan arranged by Defendant CITIC Limited and provided by Bank of China and assumption of GNC debts in the amount of $360 million.

141.    Under the proposed bankruptcy plan, in case the CITIC failed to complete the purchase of GNC assets, Defendant GNC Management will proceed with the restructuring deal with secured lenders.

142.    Included in the bankruptcy filing is a Restructuring Support Agreement (the "RSA"), pursuant to which the secured lenders would provide debtor-in-possession financing, which is supposedly to support GNC's business operations through the pendency of the Chapter 11 case.

143.    Pursuant to bankruptcy Restructuring Support Agreement (the "RSA"), the secured lenders will provide $100 million "New Money" as the debtor-in-possession DIP Term Loan Facility. As of June 30, 2020, GNC has drawn $30 million, of which $15.7 million was held in escrow in accordance with terms of the DIP Term Loan Credit Agreement, and paid $7.3 million in DIP financing fees to the secured lenders. As a result, $23 million out of the $30 million loan was not received by GNC and GNC only received $7 million of "New Money" from DIP Term Loan.

144.    In the six months ended June 30, 2020, the net cash flow provided by operating activities is -$3.44 million. This includes the $49.63 million professional fees and expenses in relation to the Chapter 11 case, without which GNC has a positive cash flow approximately $46.19 million.

145.    The record shows that no borrowings were outstanding on the $100 million Revolving Credit Facility as of June 30, 2020.

146.    As of June 30, 2020, GNC has an adequate amount of cash. The cash, cash equivalents and restricted cash was $96.43 million as of June 30, 2020, compared to $67.22 million as of December 2018, $95.89 million as of June 30, 2019 and $117.05 million as of December 31,

2019, respectively. On June 30, 2020, GNC was in a much better liquidity situation than the previous years with the debt burden being significantly reduced. All the financial data support the conclusion that the bankruptcy filing was not warranted.

147.    GNC's liquidity continued to improve through the pendency of Chapter 11 case despite little help from DIP financing. GNC's cash and cash equivalents was $126 million on October 7, 2020 when Defendant CITIC completed the purchase. The cash and cash equivalents increased a $29.57 million from $96.43 million to $126 million when the Chapter 11 case was pending.

148.    After the bankruptcy filing, GNC paid more than $10 million per month or a total of over $30 million for professional fees and expenses in relation to the Chapter 11 case according to Defendant Zhang. During the Zhang Interview on February 27, 2021, Defendant Zhang stated that "The cost during the period of bankruptcy protection is very high, much higher than we imaged….GNC has spent approximately $10 million on financial advisor fees every month, … in addition to the legal fees, the cost if very high."

149.    The secured lenders were committed to provide $100 million "new money" as DIP Term Loan. $30 million were drawn by June 30, 2020.   Assuming that GNC drew the remaining $70 million from DIP term loan after June 30, 2020, most of the money would have been spent on the $30 million plus professional fees and expenses in relation to the Chapter 11 case and the $29.57 million of increase in cash. GNC did not need the DIP financing and the bankruptcy filing was not warranted.

150.    A group of Notes holders objected to GNC's Chapter 11 plans according to bankruptcy court filing. They took aim at GNC's DIP financing, expressing concerns about how much of GNC's DIP financing loan rolled up pre-bankruptcy debt by replacing it and, potentially,

giving the secured lenders priority treatment through the Chapter 11 proceeding. Also, there were concerns about rushing through the bankruptcy process as dictated by the DIP milestones. "Without showing any necessity therefor, the Debtors [i.e., GNC] have agreed to aggressive milestones which permit their senior creditors to take advantage of a temporary dip in value because of the impact of Covid-19," the Note holders said in their objection, while asking for more time for "sufficient marketing of the Debtors business and assets in order to maximize recovery for all stakeholders."

151.    There are other concerns. On September 10, 2020, Sen. Marco Rubio on Thursday urged a national-security review panel to scrutinize a Chinese company's attempt to buy GNC. In a letter to U.S. Treasury Secretary Steven Mnuchin, Sen. Rubio (R.-Fla.) noted that Pittsburgh-based GNC keeps health data on millions of U.S. customers. Should the company be acquired by Hayao or another Chinese buyer, that data could fall into the hands of China's authoritarian government, Mr. Rubio said. "The acquisition of a major health and nutrition chain with over 5,200 retail stores in the United States and an expansive customer base presents the opportunity for state-directed actors to purchase this information legally," said Mr. Rubio, who has focused on the threat that Chinese acquisitions of U.S. companies pose to national security. Mr. Rubio asked for a review of the potential transaction by the Committee on Foreign Investment in the U.S., a Treasury-led panel that includes representatives from more than a dozen federal agencies. "The Chinese government engages in persistent efforts to obtain a broad range of sensitive American personal data through illicit means such as state-sponsored theft from government agencies and private companies."

152.    In order to ensure that Defendant CITIC, or Defendant GNC Management and secured lenders, who had agreed to split the new company 10/90, obtain the GNC, Defendant

CITIC, Zhang, GNC Management, Evercore and Berube provided false financial data projecting the disappointing GNC's financial performance in the future in order to deter the other potential bidders. From July 2020 to September 2020, under the direction of Defendants CITIC, Zhang, Martindale and Tolivar, Defendants Evercore and Berube have repeatedly sent to potential bidders false financial data and access to the virtual data room (the "VDR"), which contained false GNC financial information to purposefully deter the potential bidders from participating in the public auction. Fifteen potential bidders executed the non-disclosure agreements and accessed the VDR, including funds and banks that Plaintiffs encouraged to bid. The comments of those who reviewed VDR data were that the data did not add up.

153. According to the bankruptcy court filing, Defendants Evercore and Berube contacted or was contacted by more than 150 potential domestic and international purchasers, but none proceeded to the bidding.

154. Despite the fact that GNC has been an attractive acquisition target historically, Defendant Evercore and Defendant GNC Management managed not to find even one actionable proposal among over 200 potential buyers in approximately one year leading to the auction.

155. On October 7, 2020, Defendant CITIC completed the purchase of GNC assets through defendant ZT.

156. According to the bankruptcy court filing, "Proceeds from the Closing are being used to, among other things, pay off (a) all amounts owing under the $100 million Debtor-in-Possession Term Loan Credit Agreement, by and among GNC Corporation, General Nutrition Centers, Inc., GLAS Trust Company, LLC, as administrative agent and collateral agent, and the lenders party thereto, (b) the $100 million of roll-up term loans under the Amended and Restated Term Loan Agreement, dated as of February 28, 2018, among GNC Corporation, General

Nutrition Centers, Inc., JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, and (c) all amounts owing under the $275 million Debtor-in-Possession Amended and Restated ABL Credit Agreement, by and among GNC Corporation, General Nutrition Centers, Inc., JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto … Following the Closing, the Debtors will seek an order from the Bankruptcy Court confirming the Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan"), pursuant to which, among other things, the Debtors expect to distribute approximately (a) $126 million in cash (subject to reduction for certain amounts that may need to be escrowed in connection with the confirmation of the Plan) and $184 million in second lien notes (subject to increase to take account of any cash reduction in accordance with the terms of the Stalking Horse Agreement) issued by New GNC to the Company's Tranche B-2 term lenders (which, together with the $100 million term loan roll-up described above, would constitute an approximate recovery of $410 million to the Company's Tranche B-2 term lenders) and (b) $4.5 million in cash and $20 million in subordinated notes to be issued by New GNC to the Debtors' unsecured creditors. The Plan also contemplates that all outstanding shares of its common stock and preferred stock will be cancelled under the Plan, with shareholders receiving no distributions thereunder".

157.    The Notes holders received $20 million in new convertible Notes, which is to be converted to the common stock of New GNC as early as 2023 at a conversion price of $2.25 billion divided by the fully diluted outstanding number of shares. In other words, Defendant CITIC valued New GNC at $2.25 billion in contrast to the significantly lower price that they paid.

158.    By then, Defendant CITIC completed its scheme to acquire the valuable GNC assets. In so doing, Defendant CITIC, the controlling shareholder of GNC, unlawfully maximized its own benefit at the expenses of Plaintiffs and other minority owners.

159.     All Defendants have unlawfully enriched themselves at the expenses of Plaintiffs and other minority shareholders.

**COUNT ONE**
**FEDERAL CIVIL RICO – 18 U.S.C. § 1962(c)**
**(Against Defendants CITIC Capital, Zhang, Martindale, and Evercore/Berube)**

164.     Plaintiffs repeat and incorporate by reference each of the allegations set forth in the preceding paragraphs.

**A.     The Applicable Statutes**

165.     Under 18 U.S.C. § 1962(c) it is unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

166.     Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

167.     Under 18 U.S.C. § 1964(c), a private right of action exists for any person injured in his business or property by reason of violation of § 1962. Section 1964(c) provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

**B.     The Enterprise**

168.     GNC, a legal entity, is an Enterprise within the meaning of 18 U.S.C. § 1961(4). Under 18 U.S.C. § 1961(3) a "person" is defined to include any individual or entity capable of holding a legal or beneficial interest in property. Each RICO Defendant was involved in the operation and management of the GNC legal entity Enterprise. This Enterprise is separate and apart from the racketeering activity consisting of bankruptcy and mail/wire fraud predicate crimes.

169.    Each person or entity described as part of Defendant CITIC (see para. 32) including Defendant CITIC Holdings, Defendant Zhang, and Defendant GNC Management (see para. 33), consisting of GNC officers Martindale, Toliver, Lawrence, Canning and GNC Directors (see para. 27) also constitute an association in fact Enterprise within the meaning of 18 U.S.C. § 1961(4). This Enterprise functioned for the purpose of allowing CITIC to acquire GNC in its entirety through unlawful activities and enrich Defendants CITIC, Zhang, along with GNC Management individual defendants, by working together to avoid refinancing measures which would have benefitted all shareholders, while maximizing their financial benefit.  Each Defendant in Count One conducted the affairs of the Enterprise, or acted at the direction of others in the conduct of the affairs of the Enterprise.

### C.    The Racketeering Violation

170.    From about year 2018, and continuing up through the date of the Closing of the Bankruptcy sale, i.e., October 7, 2020,  each RICO Defendant, described herein, knowingly and unlawfully conducted or participated, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

171.    The actions of each RICO Defendant described herein constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1) because they constituted criminal offenses that were indictable as violations of the federal mail fraud statute 18 U.S.C. § 1341; the federal wire fraud statute 18 U.S.C. § 1343, and offenses involving fraud connected with a case under title 11, *i.e.,* 18 U.S.C. §152 (False Oaths and Claims).

172.    The actions constitute a pattern of racketeering activity because each Defendant as described herein, caused the commission of at least two acts of racketeering activity after the

effective date of RICO and also within 10 years of each individual act and meet the "relationship" and "continuity" criteria described below.

### D.      Racketeering Activity

173.    Over the course of years, from before June 2018 continuing to October 7, 2020, each Defendant described herein knowingly and intentionally engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c).

174.    To accomplish their schemes, artifices, and conspiracies each Defendant described herein used  interstate mail and wire transmissions which furthered and sought to further the scheme to defraud Plaintiffs and other similarly situated minority owners by wrongfully driving GNC into bankruptcy, include, but are not limited to the following:

Defendants CITIC Capital and Zhang Commission of Racketeering Acts

- See para. 48-52, Defendants CITIC Capital and Zhang used mailings and wirings, in interstate commerce, to facilitate the bankruptcy filing as a way to eliminate the high interest debt, targeting and wiping out Plaintiffs and other minority shareholders' property.

- See para. 53-65, Defendants CITIC Capital and Zhang used mailings and wirings, in interstate commerce, to facilitate the agreement to purposefully eliminate the possibility of any tender offer for an investment in GNC by a third party by virtue of CITIC's 41.02% ownership and its control of the Board.

- See para. 58-66, Defendants CITIC Capital and Zhang used mailings and wirings, in interstate commerce,  associated with the Security Purchase Agreement between CITIC and GNC, its amendment and subsequent issuances, and Stockholder's Agreement, all in furtherance of the scheme to defraud minority shareholders.

- See para. 82-84, Defendants CITIC Capital and Zhang used interstate wires and interstate phone calls to leak to the media the false information of its bid to take GNC private for the purposes to derail GNC's refinancing talks with other parties.

- See Para. 131-132, in May 2020, in response to Tang's proposal, Zhang, by text messaging and interstate phone calls, which involves interstate communication, showed false interest in Tang's proposal and later responded "not now, maybe later."

- See para. 152, from July 2020 to September 2020, Defendants CITIC Capital, Zhang, Martindale and Tolivar have directed Defendants Evercore and Berube to repeatedly send emails to potential bidders, in interstate commerce, which contained  false financial data and access via Internet to VDR, which contained false GNC financial information to purposefully deter the potential bidder from participating in the public auction.

- See para. 155, on October 7, 2020, Defendants CITIC Capital and GNC Management consummated the closing of sale of GNC assets and proceeds were distributed through bank wirings, in interstate commerce, to multiple parties.

Defendants Martindale and Tolivar Commission of Defendant Racketeering Acts

- See para. 78, at the 3rd Qtr. 2019 earnings release conference call on October 24, 2019, Martindale communicated, via interstate phone, and e-mail, with investors located throughout many states, to disseminate misleading information regarding the prospect of long-term solution to capital structure.

- See para. 79, Tolivar participated in the call and communicated via interstate phone call, and e-mail, to investors located throughout the many states misleading information regarding the prospect of long-term solution to capital structure.

- See para. 80, Tolivar and Martindale's representations that were made at conference by wirings in interstate commerce, were contradictory to the Evercore/Berube Declaration.

- See para. 84, Tolivar traveled in interstate commerce to Hong Kong to discuss false information of possible buyout of GNC.

- See para. 97, Defendants Martindale and Tolivar caused the payment of $49.63 million in professional fees relation to the Chapter 11 cases by mailings and interstate wires, which Defendants buried in selling, general and administrative charges.

- See para. 104, During the morning conference call on March 26, 2021, Martindale and Tolivar made misleading statements regarding the refinancing of GNC's capital structure. Advisors and analysts from different states dialed in through the internet to participate in the call.

- See para. 104-106, Defendants Martindale and Tolivar stated they were actively seeking options to avoid the bankruptcy filing, they did not. Instead, Defendants GNC Management, CITIC, and Evercore conspired to file for the bankruptcy. Later GNC Management Defendants directed many materials related to the bankruptcy proceedings to shareholders by mail and e-mail.

- See para. 107-109, Defendants Martindale, Tolivar and GNC Management took measures to increase the net intrinsic value of GNC at others' expenses, and for their own and others benefit, so that Defendant GNC Management can hand over to the secured lenders through Chapter 11 case in exchange for a fat reward package, including retention bonus and 10% common stock in the new restructured company; Defendant GNC Management were in direct talks with secured lenders via mailings and interstate wires.

- See para. 113, On April 15, 2020, Martindale responded to Tang's letter by email: "Rest assured that our Board is actively engaged, working hard to explore all alternatives to preserve and maximize the value of the Company." The representations in this response were false and designed to deter Plaintiffs from avoiding the bankruptcy.

- See para. 120, on April 22, 2020, Martindale emailed another letter to Plaintiff Tang falsely stating that management team are committed to maximizing the value of the company for the benefit of all stakeholders while bankruptcy preparation was already in process.

- See para. 121-122, through the use of interstate wiring in a SEC filing, and a news release, after receiving the notice that the Company was no longer in compliance with the listing requirements, Defendant Martindale, Tolivar and GNC Management falsely announced that GNC intended to timely notify the NYSE of its intent to present a plan to cure the Market Capitalization Deficiency when GNC Management and CITIC already decided to file bankruptcy.

- See para. 128, on May 11, 2020, Tolivar in a conference call, with participants dialed in by the internet, made false statements regarding GNC's financial position.

- See para. 130, on May 11, 2020, Martindale sent by e-mail a letter to employee and franchisees containing misstatements of the intent of GNC management regarding Chapter 11 bankruptcy, which was secretly in process.

- See para. 135-137, on May 15 and June 12, 2020, Defendants Martindale, Tolivar and GNC Management announced through interstate wire, that is, a SEC filing, falsehoods relating to management's efforts to work a solution to spring maturity issues.

- See para. 152, from July 2020 to September 2020, under the direction of Defendants CITIC, Zhang, Martindale and Tolivar, Defendants Evercore and Berube have repeatedly sent

emails, which travelled in interstate commerce, to potential bidders that contained false financial data and access via Internet to the VDR, which contained false GNC financial information, to purposefully deter the potential bidder from participating in the public auction.

Defendants Evercore and Berube Commission of  Racketeering Acts

- See para. 57, 95, 126, 133-134, regarding violations of Title 18 U.S.C. § 152(2), there were several affidavits by Evercore/Berube (false oaths) as to the solicitation of potential investors filed with the bankruptcy court, which travelled in interstate commerce, which falsely claiming that GNC Management and Evercore were actively seeking refinancing while in fact GNC Management and Evercore actively avoided outside investors to further the unlawful scheme of driving GNC to bankruptcy. Tolivar also made false oaths in affidavits as to the necessity of the bankruptcy filing.

- See para. 126, On May 5, 2020, during the conference call which included persons using facilities form different states, Defendant Evercore and Berube lied to Plaintiffs that there could be potential another lender for the purpose of not proceeding with Plaintiffs' offer of loan.

- See para. 152, from July 2020 to September 2020, Defendants Evercore and Berube have repeatedly sent emails to potential bidders, which travelled in interstate commerce and contained false financial data and access via Internet to the VDR, which contained false GNC financial information to purposefully deter the potential bidder from participating in the public auction.

**E.** **Pattern of Racketeering**

175.    Defendants CITIC Capital, Zhang, Martindale, Tolivar, Evercore and Berube, participated in the above schemes through at least two acts of racketeering activities in violation of the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B).

176.    Defendants' unlawful schemes converged at the completion of the Chapter 11 bankruptcy filing on June 23, 2020.

177.    Each Defendant has engaged in a pattern of racketeering activity. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the Enterprise. Each Defendant had the specific intent to engage in the substantive RICO violation alleged herein.

178.    Each Defendant has engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961(1), 1961(5), because, as described above, they have engaged in the foregoing incidents of racketeering activity during the period 2018-2020, including mail fraud, wire fraud, and fraud involving false oaths in violation of Title 18.

179.    The incidents of racketeering activity were related to each other in that they had the same or similar effects, results, participants, methods of commission, victims, and purpose (the control of GNC and the deprivation of rights of Plaintiffs in GNC).

180.    The racketeering acts were not isolated incidents, but were continuous conduct and such incidents of racketeering activity continued over a substantial period of time, i.e., from February 2018 through October 7, 2020, a time period over two and one-half (2 ½ )years.

**F.** **The Injury**

181.    The RICO Defendants' goal was to preserve, not to destroy, GNC assets for themselves through the bankruptcy filing. The RICO Defendants have targeted Plaintiffs and other

minority owners who owned GNC, as well as unsecured creditors, including suppliers, landlords, contractors, etc. Plaintiffs have incurred injury to their property (including, but not limited to, their interests in GNC) by reason of Defendants violations of 18 U.S. Code § 1962. The injury is direct and personal. As a result, Plaintiffs are entitled to recover three-fold their damages suffered, plus attorney's fees and costs, pursuant to 18 U.S. Code § 1964(c).

## COUNT TWO

### FEDERAL CIVIL RICO CONSPIRACY – 18 U.S.C. § 1962(d)
### (Against Defendants CITIC, GNC Management, Evercore/Berube, ABC Company and John Doe)

182.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

### A.    The Conspiracy

183.    Plaintiffs allege that from year 2018 through and including October 7, 2020, Defendants conspired to violate section 1962(c), i.e., each Defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. §§ 1341 (Mail Fraud) and 1343 (Wire Fraud), 18 U.S.C. §152 (false oaths) as more fully described in Count One.  Plaintiffs allege that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiffs' business and property, and that such conspiratorial conduct violates RICO §1962(d).

184.    Each Defendant 'adopted the goal of furthering or facilitating the criminal endeavor,' which acts as described in Count One were completed and satisfied by at least one substantive Defendant.  As demonstrated in detail above, Defendants have engaged in systemic fraudulent practices designed to defraud Plaintiffs of money and other property interests.

185.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the

objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

### B.  Role of Each Conspiracy Defendant

186.    Defendant CITIC consists of CITIC Capital, CITIC Limited, CITIC Partners,  New GNC, ZT, Zhang, Wong and Allegaert, as described in para. 32. Each of these persons and entities, except for CITIC Limited that approved and participated in the conspiracy, were and are under the common control of Zhang, who is the Chairman and CEO of CITIC Capital and Chairman of New GNC. Zhang did commit a pattern of racketeering and other members of Defendant CITIC agreed to adopt the goal of furthering or facilitating the criminal endeavor, which acts as described in Count One were completed and satisfied by at least one substantive Defendant.

187.    Defendant Martindale, Defendant Tolivar did engage in a pattern of racketeering, and Defendants Lawrence, Canning, and GNC Directors (see para. 27), all under the influence of substantive defendants, agreed to 'adopt the goal of furthering or facilitating the criminal endeavor' by these substantive defendants, which acts as described in Count One were completed and satisfied by at least one substantive Defendant.

188.    Defendant Evercore and Defendant Berube, substantive RICO defendants, did commit a pattern of racketeering and agreed that Martindale, Tolivar and other substantive RICO defendants, would adopt the goal of furthering or facilitating the criminal endeavor by these substantive defendants.

### C.  The Injury

189.    As a direct and proximate result of Defendants' predicate acts in furtherance of violating 18 U.S.C § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and is continuing to be injured in their business or property as set forth more fully above.

## COUNT THREE

**(Claim of Fraud Against Defendant CITIC Capital, Zhang, Martindale, Tolivar and Defendant Evercore/Berube)**

197.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

198.    Defendants CITIC Capital and Zhang, knowingly and intentionally misled Plaintiffs by concealing their unlawful scheme to obtain GNC's assets.

199.    Defendant CITIC and Zhang knowingly and intentionally misled Plaintiffs by false statements of buyout.

200.    Defendants Martindale and Tolivar knowingly and intentionally misled Plaintiffs by disseminating false information and concealing their unlawful scheme.

201.    Defendant Evercore and Berube knowingly and intentionally disseminated false information and participated in the above scheme to their own benefits.

Defendants CITIC/Zhang Commission of Fraudulent Acts

•       See para. 48-52, CITIC and Zhang devised, drove and facilitate the bankruptcy filing as a way to eliminate the high interest debt, targeting and wiping out Plaintiffs and other minority shareholders' property.

•       See para. 53-65, CITIC and Zhang purposefully eliminated the possibility of any tender offer for an investment in GNC by a third party by virtue of CITIC's 41.02% ownership and its control of the Board.

•       See para. 82-84, Defendant CITIC and Zhang purposefully leaked to the media the false information of its bid to take GNC private for the purposes to derail GNC's refinancing talks with other parties.

- See Para. 131-132, in May 2020, in response to Tang's proposal, Zhang, by text messaging and interstate phone calls, showed false interest in Tang's proposal and later responded "not now, maybe later."

- See para. 152, From July 2020 to September 2020, Defendants CITIC and Zhang have directed Defendants Evercore and Berube to repeatedly send emails to potential bidders that contained false financial data and access via Internet to VDR, which contained false GNC financial information, to purposefully deter the potential bidder from participating in the public auction.

Defendants Martindale and Tolivar Commission of Fraudulent Acts

- See para. 78, at the 3rd Qtr. 2019 earnings release conference call on October 24, 2019, Martindale communicated with investors to purposefully disseminate misleading information regarding the prospect of long-term solution to capital structure.

- See para. 79, Tolivar participated in the call and communicated with investors to purposefully disseminate misleading information regarding the prospect of long-term solution to capital structure.

- See para. 80, Tolivar and Martindale's false representations that were made at conference were contradictory to the Evercore/Berube Declaration.

- See para. 84, Tolivar traveled in interstate commerce to Hong Kong to discuss false information of possible buyout of GNC.

- See para. 97, Defendants Martindale and Tolivar caused the payment of $49.63 million in professional fees relation to the Chapter 11 cases to be buried in selling, general and administrative charges.

- See para. 104, During the morning conference call on March 26, 2021, Martindale and Tolivar purposefully made misleading statements regarding the refinancing of GNC's debt.

- See para. 104-106, Defendants Martindale and Tolivar stated they were actively seeking options to avoid the bankruptcy filing, they did not. Instead, it is alleged that GNC Management, CITIC, and Evercore conspired to conceal the decision for bankruptcy filing.

- See para. 107-109, Defendants Martindale, Tolivar and GNC Management took measures to increase the net intrinsic value of GNC at others' expenses, and for their own and others benefit, so that Defendant GNC Management can hand over to the secured lenders through Chapter 11 case in exchange for a fat reward package, including retention bonus and 10% common stock in the new restructured company.

- See para. 113, On April 15, 2020, Martindale responded to Tang's letter by email: "Rest assured that our Board is actively engaged, working hard to explore all alternatives to preserve and maximize the value of the Company." The representations in this response were false and designed to deter Plaintiffs from avoiding the bankruptcy.

- See para. 120, on April 22, 2020, Martindale emailed another letter to Plaintiff Tang falsely and purposefully stating that management team are committed to maximizing the value of the company for the benefit of all stakeholders while bankruptcy preparation was already in process.

- See para. 121-122, after receiving the notice that the Company was no longer in compliance with the listing requirements, Defendant Martindale, Tolivar and GNC Management falsely announced that GNC intended to timely notify the NYSE of its intent

to present a plan to cure the Market Capitalization Deficiency when GNC Management and CITIC already decided to file bankruptcy.

- See para. 128, on May 11, 2020, Tolivar in a conference call purposefully made false statements regarding GNC's financial position.

- See para. 135-137, on May 15 and June 12, 2020, Defendants Martindale, Tolivar and GNC Management announced, through a SEC filing, falsehoods relating to management's efforts to work a solution to springing maturity issues.

- See para. 152, from July 2020 to September 2020, Defendants CITIC, Zhang, Martindale and Tolivar have directed Defendants Evercore and Berube to repeatedly provide to potential bidders with false financial data and access via Internet to the VDR, which contained false GNC financial information, to purposefully deter the potential bidder from participating in the public auction.


Defendants Evercore and Berube Commission of  Fraudulent Acts


- See para. 126, On May 5, 2020, during the conference call, Defendant Evercore and Berube lied to Plaintiffs that there could be potential another lender for the purpose of not proceeding with Plaintiffs' offer of loan.

- See para. 152, from July 2020 to September 2020, Defendants Evercore and Berube have repeatedly provided to potential bidders with false financial data and access via Internet to the VDR, which contained false GNC financial information, to purposefully deter the potential bidder from participating in the public auction.

202.     Defendants acted under false pretense to make false statements, make misleading press releases, and act deceitfully to conceal their schemes to target Plaintiffs and other minority owners for their own benefits.

203.     The false information provided by Defendants is material and important.

204.     Plaintiffs and other minority shareholder have relied on Defendants' misrepresentation to approve CITIC's investment in GNC, vote with GNC Management's proposals, terminate the plan for special shareholder meeting  and avoid the divestment of the interest in the Company.

205.     Plaintiffs have been damaged in their property, including, but not limited to, their interests in GNC, by reason of Defendants' unlawful and fraudulent acts and are entitled to recover compensatory damages suffered and punitive damages sufficient to deter Defendants from committing such lawful and fraudulent conducts in the future, plus attorney's fees and costs.


## COUNT FOUR

**(Claim of Conspiracy to Defraud Against Defendants CITIC, GNC Management, Evercore/Berube, ABC Company and John Doe)**

206.     Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

207.     Defendants CITIC, GNC Management, Evercore, ABC Company, John Doe and each of them conspired with each other to knowingly and intentionally concealed their unlawful schemes to enrich themselves at the expenses of Plaintiffs and other minority owners of GNC.

208.     Plaintiffs have been damaged in their property, including, but not limited to, their interests in GNC by reason of Defendants' unlawful and fraudulent acts and are entitled to recover compensatory damages suffered and punitive damages sufficient to deter Defendants from committing such lawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT FIVE

### (Claim of Breach of Fiduciary Duties Against Defendants CITIC, Wong, Martindale and GNC Directors)

209.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

210.    As a majority shareholder and directors of GNC, Defendants CITIC, Wong, Martindale, and GNC Directors owed fiduciary duties to Plaintiffs and other minority owners.

211.    By entering into a fraudulent scheme and conspiracy to destroy Plaintiffs and other minority owners' rights and interests in GNC, those defendants breached their fiduciary duties, including the duty of loyalty, to Plaintiffs.

212.    As a result of these breaches, Plaintiffs have been damaged as determined at trial.

## COUNT SIX

### (Claim of Conversion Against Defendants CITIC and Zhang)

213.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

214.    Plaintiffs, other minority owners and the Defendants are the joint owners of GNC.

215.    The Defendants only owned 41.02% of GNC.

216.    The Defendants have taken Plaintiffs' interests in GNC through unlawful scheme and fraudulent acts.

217.    As a result of these unlawful and fraudulent acts, Plaintiffs have been damaged as determined at trial.

## COUNT SEVEN

### (Claim of Negligence Against Defendants Martindale and GNC Directors)

218.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

219.    Defendants owed fiduciary duty to Plaintiffs and other minority owners.

220.    Defendants knew or should have known that Defendants CITIC and Zhang devised and implemented the unlawful scheme.

221.    Defendants Martindale and GNC Directors' inaction with regard to the unlawful scheme breached their duty and constituted negligence.

222.    Defendants Martindale and GNC Directors' negligence were the actual and proximate cause of harm to Plaintiffs.

223.    As a result of Defendants Martindale and Senior Directors' negligence, Plaintiffs have been damaged as determined at trial.

## COUNT EIGHT

### (Claim of Aiding and Abetting a Conspiracy Against Defendants GNC Management, Evercore, Berube, ABC Company and John Doe)

224.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

225.    Defendants Martindale, Tolivar, GNC Directors, Evercore, Berube, ABC Company, and John Doe willingly aided and abetted the unlawfully conspiracy against Plaintiffs.

226.    Plaintiffs have been damaged and injured as a result of such aiding and abetting in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment for the following relief:

(a)    Awarding Plaintiffs three-fold their damages suffered, plus attorney's fees and

costs, pursuant to 18 U.S. Code § 1964(c).

      (b)     Awarding all other remedies provided for pursuant to 18 U.S. Code § 1964(a), including, but not limited to:

        1) Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

        2) Imposing reasonable restrictions on the future activities or investments of Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of 18 U.S. Code § 1962;

        3) Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of 18 U.S. Code § 1962;

        4) Assessing civil monetary penalties against Third Party Defendants of three times the amount of their gain as a result of their violation of 18 U.S. Code § 1962; and

        5) Ordering Defendants to forfeit their interests they have acquired or maintained in violation of 18 U.S. Code § 1962, and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.

      (c)     Awarding Plaintiffs their compensatory damages against Defendants;

      (d)     Awarding Plaintiffs punitive damages against Defendants;

      (e)     Awarding Plaintiffs their attorney's fees and costs in this action; and

      (f)     For such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Defendants hereby demand trial by jury on all issues triable by jury.

Dated: February 13, 2023

Respectfully submitted,

By: _____ */s/ John Y. Tang* _____
         John Y. Tang

John Y. Tang (N.Y. SBN: 4728580)
**Tang PC**
1702 Flushing Ave
Ridgewood, NY 11385
Telephone: (212) 363-0188
Facsimile: (212) 981-4869
john.tang@gettang.com

Wenjie Cai (N.Y. SBN: 5867569)
**Tang PC**
1702 Flushing Ave
Ridgewood, NY 11385
Telephone: (212) 363-0188
Facsimile: (212) 981-4869
ericat@gettang.com

*Counsel for the Plaintiffs*